**W. G. ELLIS et al., Appellants,**

v.

**SECURITY UNDERGROUND STORAGE, INC., et al., Appellees.**

No. 16037.

Court of Civil Appeals of Texas.

Fort Worth.

Nov. 6, 1959.

Rehearing Denied Dec. 4, 1959.

Bullington, Humphrey, Humphrey & Fillmore, and Leslie Humphrey, Wichita Falls, Vinson, Elkins, Weems & Searls, and Tarlton Morrow, Houston, and Hart & Hart, and James P. Hart, Austin, for appellant.

Anderson, Latham & Castledine, Wichita Falls, W. St. John Garwood, Austin, and Jones, Parish & Fillmore, R. Larry Robinson and Elmer H. Parish, Wichita Falls, for appellee.

MASSEY, Chief Justice.

The appeal before us is from an order of the trial court overruling the pleas of privilege of the defendants sued below. The suit is one for the statutory penalty provided in instances where interest in excess of 10% per annum is exacted as applied to payments heretofore paid, and to cancel contractual provisions relative to usurious interest which has not yet been paid.

Judgment is affirmed.

We will refer to the parties by name where spoken of individually and as plaintiffs or defendants where mentioned collectively. The plaintiffs, appellees here, were Gaines H. Billue, Henry J. Anderson, Jr., and Security Underground Storage, Inc. The defendants were W. G. Ellis and Vernon Elledge, both residents of Harris County, Texas. At all material times the plaintiffs' residences were in Wichita County, Texas, and they filed their suit in that county. Defendants filed their separate pleas of privilege to be sued in Harris County.

Following a hearing before the court without intervention of a jury, the order overruling the defendants' pleas of privilege was entered. There was no request for findings of fact and conclusions of law and none were filed in the case.

Our conclusion that judgment below should be affirmed is predicated upon our belief that issues of fact upon the venue question were raised by the pleadings and the evidence which the trial court, as the trier of the facts, was entitled to resolve as it did.

The single point presented by the defendants advances the contention that the trial court erred in overruling the pleas of privilege because: "Under the undisputed evidence and the admissions of the plaintiffs, the contract between the parties was not for a loan of money (and therefore could not be usurious) but it was a contract in the nature of a grubstake deal, whereby plaintiffs Security, Billue and Anderson were enabled to secure valuable property and contract rights because defendant Ellis contracted to risk his property, credit and collateral to obtain financing of the project, in return for plaintiffs' agreement that the cost of the project plus interest would be repaid out of the proceeds of the venture and that Ellis in lieu of a share in profits was granted a fraction of the rentals."

As previously indicated, our conclusion is that the trial court's judgment was properly based upon disputed issues raised by the evidence, from which a fact finder was entitled to find that the contract was for a loan of money, made with the understanding that the same was to be returned and that a greater rate of interest than that allowed by law was provided to be paid. There is no question but that usurious interest has been paid for the use, forbearance, or detention of the money received under and by virtue of the contract, or contracts, between the parties, if we are correct in the aforesaid conclusion.

The parties to the appeal differ widely upon the matter of whether it is the duty of this court to affirm the trial court in its action if there is any evidence in the record which will support its ruling. The plaintiffs contend for the application of this rule. The defendants advance the proposition that because the case is a usury case, the inquiry is not whether there is any evidence to support the finding of usury, but is as to whether there is any evidence

upon which the contract can be held to be lawful rather than unlawful. Defendants claim, in effect, that in the event an examination of the record as a whole demonstrates circumstances which would have entitled the fact finder to decide that something other than usurious interest was contracted to be paid no finding to the contrary would be permitted to stand. We cannot agree with the defendants. If their contention has merit then there would rarely be a successful civil case based upon usury where the fact of its existence in ordinary commercial contractual transactions is colored, if not covered, by fictitious language bearing upon "time price" or upon "carrying charges", etc., which so often have been held subject to scrutiny by juries in resolving the question of whether such contracts in fact do provide for usurious interest.

Defendants further claim that because of the fact that prior to the delivery of the promised compensation by plaintiffs the contract under and by reason of which it was delivered had been changed so that plaintiffs were relieved of any personal liability in the event of nonpayment, and that in such an event defendants would be restricted to the rentals received because of the use of the property by others, or to the property itself. We cannot believe that in and of itself such a contractual provision would operate to remove the taint of usury if it was in the contract aside from any consideration of the provision. If the principle contended for by defendants should be upheld by the courts, lenders of small amounts, secured by property worth many times the amount loaned, could safely charge interest in excess of the legal rate by merely providing that the borrower would never be personally liable over and above the remedy the seller would have by foreclosing upon the property pledged as security.

In the instant case the plaintiffs found themselves, in the spring of 1956, with a contract from the government whereby they would lease to it a certain property for the purpose of underground storage of liquid fuel. They were, however, obliged to present to the government the property to be leased in a particular kind of condition and with specified equipment necessary for the government's accomplishment of its purpose in renting the premises. Plaintiffs had little or no capital at the time. They were in the position of the man who knows that he can make a million dollars if he can get his hands on a quarter of a million dollars to use. Indeed, this was substantially the position in which plaintiffs found themselves.

The contract with the government was subject to the appropriation of funds committed to the performance on the part of the government of its obligations under the contract with the plaintiffs. It also provided that plaintiffs must have the premises complete and ready for inspection within 10 months after the assignment or committing of funds appropriated for the purpose, or after notice of commencement of construction, whichever should be earlier, and that no rentals would be owed by the government until there had been an acceptance of the premises by a government inspector. Said government contract was for a period extending to June 30, 1957, or about 17 months, and ended at that time unless renewed by the government. If an appropriation was assigned to the contract, and if the caverns were completed and operated as specified, and if the government accepted them, the government agreed to pay the following rental:

| | Rental for one barrel per month | Rental for 300,000 bbl. per year |
|---|---|---|
| First 12 mo. after acceptance | $0.129350 | $465,660.00 |
| Second 12 mo. after acceptance | 0.077040 | 277,344.00 |
| Third 12 mo. after acceptance | 0.070981 | 255,532.00 |
| Fourth 12 mo. after acceptance | 0.070622 | 254,239.00 |
| Fifth 12 mo. after acceptance | 0.070457 | 253,645.00 |
| From then to June 30, 1962 | 0.051970 | |

It was further provided that if the government did not renew for one year from June 30, 1957, it would nevertheless pay

the full first year's rental, amounting to $465,660.00.

From the foregoing the position in which the plaintiffs found themselves is self-explanatory. From their own calculations it would require only $365,000 to become landlord lessors of realty which would bring a return from their tenant of nearly 120% of the investment the first year, and around 75% as to each year the government renewed its contract. It is natural that they would devote every effort to obtain the financing necessary to enable them to put themselves in position to perform their part of the contract with the government.

Ultimately plaintiffs contacted and interested the defendant W. G. Ellis. Ellis' attorney was Vernon Elledge, also a defendant herein, and he acted in Ellis' behalf in drawing the instruments evidencing the contractual arrangement between plaintiffs and Ellis, and later on bought a "piece" of Ellis' rights under and by reason of his contract with the plaintiffs. Under the contract the plaintiffs performed the obligations incumbent upon them which, it was agreed, entitled them to receive financing, i. e., funds with which to purchase the premises and do the work. Use of said funds placed the property in condition where the government did later lease it and pay agreed rental amounts therefor. It will not be necessary to detail the performance as aforesaid on the part of the plaintiffs and reference to it or any part of it will be incidental only to our discussion.

Ellis initially agreed, in exchange for the promises of the plaintiffs, to provide plaintiffs with "interim financing" to the extent of $365,000. Since the plaintiffs did not need the entire amount promised to be provided immediately, but only lesser amounts as they expended funds in the preparation of the premises, it was agreed that they would "immediately execute and deliver to Ellis their joint and several promissory note in the sum of $365,000, bearing interest at the rate of 6% per annum on the amount of each advance of funds loaned under said note from the date such advance of funds is placed to the credit * * *." Since it was anticipated that the repayment of the funds received by the plaintiffs would come from the rental checks they received from the government after the government leased and began using the premises, a paragraph in the contract provided: "It is agreed that as each monthly rental check is received from the government, First Parties (plaintiffs) will immediately endorse such rental check and send it to a bank designated by Ellis for deposit to the credit of Ellis * * *." Alternatively, it was provided that in the event the government terminated the contract of lease at the end of the first year, the termination payment provided for by the contract of lease would be forwarded to Ellis to be applied on the note to the extent necessary to pay the note, plus an additional $25,000 to be retained by Ellis.

Further, it was required by the contract that Ellis would be provided with a life insurance policy in the sum of $500,000 on the life of Billue with a loss payable clause to provide that the proceeds of the policy should be paid to Ellis or his assignee in such amount as might be necessary to repay advances theretofore made by Ellis.

Finally, the most important provisions of the contract, for our purposes in considering the case on appeal, provided: "As an additional consideration for the making of this loan, and in lieu of and in substitute for any sharing by Ellis in the profits of the venture, there shall be paid to Ellis the following amounts: A. On each cavern constructed * * * 10% of the gross rental * * * paid * * * from 12 months after the date of acceptance * * * until June 30, 1962, unless sooner terminated by the government. * * * C. * * * 5% of the gross rental on each cavern paid by Armed Services Petroleum Purchasing Agency for as long as Armed Services Petroleum Purchasing Agency or any other agency of the govern-

ment pay rental on said caverns, it being the intention that the payment of said 5% * * * shall be continued permanently so long as this project is owned and rented by First Parties (plaintiffs), or any of them. D. On the entire project, * * * the sum of $5,000.00 per year for a period of five years, beginning July 1, 1957, * * * except as provided in Paragraph E, below. E. In event the Armed Services Petroleum Purchasing Agency should not exercise its option to extend said contract beyond June 30, 1957, First Parties shall pay to Ellis * * * the sum of $25,000.00, and thereafter shall pay to Ellis 10% of the gross rental received by First Parties, or any of them, from any other party for rental of the caverns constructed under the terms of said contract and of any other caverns constructed as a part of the same project * * * for a period of five years from June 30, 1957, plus 5% of all gross rentals * * * it being intended that the payment of said 5% of the gross rental shall be continued permanently so long as this project is owned and rented by First Parties or any of them. * * * If, at any time hereafter, the Armed Services Petroleum Purchasing Agency should discontinue renting said storage project and First Parties should be unable to rent said storage on a profitable basis to other parties, and should desire to sell * * * free and clear of the right of Ellis to receive a part of the rental, Ellis shall have the preferential right and option to purchase the same on the same terms offered by any bona fide prospective purchaser. * * * If Ellis does not accept such offer * * * then First Parties shall be free to sell to such prospective purchaser in accordance with the offer made, and if such sale is made free and clear of the right of Ellis to receive the part of the rentals herein stipulated, then Ellis shall receive 5% of the gross sale price."

Immediately following the foregoing provisions, the following important paragraph appears in the instrument of contract: "It is understood and agreed that the basic nature of this contract is that First Parties desire to borrow the sum of $365,000 with which to construct the caverns called for in said Contract No. ASP 12,260, and that Ellis is to assist First Parties by providing the collateral and financial responsibility necessary to enable a bank loan to be made to provide such interim financing; *and that the considerations above specified to be paid to Ellis are to be paid to him as consideration for his signing, endorsing or guaranteeing the notes of First Parties, so as to obtain for them the needed interim financing.*" (Emphasis supplied.)

Plaintiffs did execute a promissory note for $365,000.00 as agreed, with the payee designated " * * * to the order of W. G. ELLIS, at South Main State Bank, in the City of Houston, Harris County, Texas." A few days thereafter, as security for "a note in the sum of $200,000.00 * * * executed by W. G. Ellis, payable to South Main State Bank, of Houston, Texas," Ellis transferred and conveyed unto the said Bank the $365,000 note executed by the plaintiffs and naming him as the payee.

By the fall of 1956 there was a dispute between the parties, the essence of which is not material, but in the solution of it the contract was amended so that the "additional compensation" provided to be delivered to Ellis and heretofore set out was increased substantially as follows: Under "A" an increase from 10% to 17% of the gross rental paid until June 30, 1962; and under "C" an increase from 5% to 15% of the gross rental received from any agency of the government and so long as there was no change in the ownership of the properties. Other changes were made also which we deem immaterial or unnecessary to mention here. As a part of the consideration for the change it was provided that the extension note evidencing the indebtedness of the plaintiffs would be drawn so as to provide that none of the plaintiffs would be personally liable or obligated thereon, and that thereafter Ellis would look only

to the rentals to be received from the government as the security for and source of payment of the principal and interest of the note, or by enforcement of liens theretofore executed to Ellis upon the premises acquired as part of plaintiffs' venture.

By May 23, 1958, when the plaintiffs' suit was filed, it is demonstrated in the evidence that amounts exceeding that equal to the maximum lawful interest allowed by law had been paid by the plaintiffs and received by the defendants under and by virtue of the contract. Therefore, if the consideration contracted to be delivered to Ellis, and delivered to the defendants herein by plaintiffs, actually was interest within the contemplation of law, there is no question but what usury was proved.

 Without detailing the evidence in the record, which is voluminous and demonstrative of the manner in which the parties and agents for the parties conducted their respective activities in performance of the contract according to the agreements thereof, we are satisfied that such evidence supports the plaintiffs' theory and adequately raises the ultimate issue of whether there was an intent on the part of Ellis (and through Ellis extending to all defendants) to charge usury. The conflicting provisions of the initial contract and the same as amended certainly evidence ambiguity, and of such nature that parol evidence was properly admitted in the determination of intent, even were this other than a usury case. Construction was for the jury or other finder of fact. 10–A Tex.Jur., p. 406, "Contracts", sec. 198, "Construction by Court or Jury". In the instant case the plaintiffs assert that the parol evidence is undisputed. Though we do not agree, even should we lend credence to the assertion the answer to the ultimate issue in this case involves inquiry into the mental attitude of the defendants, or in any event of Ellis, and resolution of the question must be by the jury or other fact finder, who should of course proceed "under such safeguards * * * as effectually to segregate the mede of fact from the larger measure of law." Speer's Law of Special Issues in Texas, p. 137 et seq., "Ultimate Fact Issues", sec. 103, "Miscellaneous complex facts".

Both plaintiffs and defendants attempt to demonstrate in their briefs the security of their respective positions with reference to the guiding principles set forth in the leading case of Greever v. Persky, 1942, 140 Tex. 64, 165 S.W.2d 709. In very material degree the conclusion upon which we have arrived in the instant case was through application of those guiding principles to the factual situation posed in the record before us. Certainly we cannot add to the clarity of Chief Justice Alexander's discussion and explanation of the tests to be made in the determination of whether there was or not a fact issue for determination in a suit on contractual usurious interest. It may be that in a situation similar to that involved in the instant case it would be possible for the parties to both contract and perform thereunder in a manner which would entitle the party providing the financing or means of financing to the other party to a judgment as a matter of law in the event the latter should sue him under Art. 5073, Vernon's Annotated Texas Civil Statutes, but under the record before us the instant transaction was not such a case. The question was one for determination of the trier of fact, and the judgment entered upon the entire record was in our view that proper to be rendered.

Judgment is affirmed.